FILED

AUG 0 2 2017

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

JADE SAND,                          )        Civ. No. 17- 5063
                                    )
            Plaintiffs,             )
                                    )
vs.                                 )        **COMPLAINT**
                                    )
WELLS FARGO BANK, N.A.,             )
                                    )
            Defendant.              )
                                    )

## PARTIES

1.    Plaintiff Jade Sand is a resident of Arizona.

2.    Wells Fargo Bank, N.A. ("Wells Fargo") is a national bank with its main office and domicile in Sioux Falls, South Dakota, as set forth in its articles of association.

## JURISDICTION

3.    There is complete diversity of citizenship between the Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

4.    Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over state law claims in this complaint.

## VENUE

Venue is properly laid within the District of South Dakota pursuant to 28 U.S.C. § 1391 (b)(1).

1

## FACTUAL BACKGROUND

5. In January 2011, Wells Fargo implemented a new employee background screening program, "WFHM HR Background Checks Project."

6. Wells Fargo had previously screened the backgrounds of all of its employees, including Plaintiff, prior to initial hire.

7. Wells Fargo represented to Plaintiff and employees across all sectors of its operations that the new background checks were necessary in order to comply with new federal regulation, including "compliance with SAFE," and that all employees were required to consent to fingerprinting.

8. The Secure and Fair Enforcement for Mortgage Licensing Act (SAFE Act) applied only to mortgage loan originators ("MLOs").

9. Hundreds of Wells Fargo employees, who were rescreened pursuant to the Background Checks Project, were not MLOs and had no relation whatsoever to the SAFE Act.

10. Plaintiff, along with at least hundreds of other employees, received notification that pursuant to the new screening, "a record was found making you ineligible for employment with Wells Fargo."

11. Plaintiff and thousands of fellow employees were abruptly fired by Wells Fargo.

12. The SAFE Act does not require banks to fire employees with background convictions.

13. Wells Fargo later represented to Plaintiff that he had been

2

terminated pursuant to FIRREA/the FDI Act (codified as 18 U.S.C.A 1829), not "in compliance with SAFE," as Wells Fargo had represented earlier.

14.     The FDI Act was enacted in 1950, decades prior to the *hire* of Plaintiff (or any of the employees fired in 2011 and after, under the auspices of SAFE).

15.     The FDI Act imposed a duty upon FDIC-insured banking institutions, including Wells Fargo, to seek FDIC consent *prior to hiring and employing* persons with certain convictions.

16.     The consent requirement allows the FDIC to assess the relative degree of risk posed by the potential employee to the insurability of the institution, particularly for persons involved in management and control of the institution.

17.     The FDIC stated in its 1998 Statement of Policy, detailing and establishing the requirements of its consent, that "an individual should generally not be prohibited from participating in banking because of a singular offense of lesser consequence."

18.     Nevertheless, Wells Fargo's affirmative policy was to ignore its duty, as an FDIC insured banking institution, under the FDI Act of 1950/ 18 U.S.C.A 1829 which required Wells Fargo to seek FDIC consent prior to hiring or employing such individuals.

19.     Wells Fargo arbitrarily hired and employed persons <u>who disclosed prior convictions</u>, without seeking FDIC consent, because "[d]isclosures of convictions on employment applications submitted to Wells

3

Fargo do not automatically disqualify applicants from hire if a background check confirms they are eligible for employment."

20.     Numerous employees including Plaintiff, who were terminated amid Wells Fargo's Background Checks Project in 2011 and after, had fully disclosed prior convictions of lesser consequence to Wells Fargo, had undergone background checks, and had been assured by Wells Fargo that his background records presented no obstacle to employment.

21.     Wells Fargo did not seek or secure FDIC consent waivers for these employees.

22.     Wells Fargo did not inform these employees of the FDIC waivers, or Wells Fargo's duty to seek FDIC consent upon notice of a conviction.

23.     Plaintiff acted in reliance on Wells Fargo's assurance that his prior convictions were not an obstacle to employment, passed on other lucrative opportunities, and importantly, joined Wells Fargo in lieu of other business opportunities.

24.     Wells Fargo also did not seek or secure FDIC consent prior to hiring or employing Plaintiff and did not inform Plaintiff of its duty to do so.

25.     Wells Fargo admitted in Iowa Civil Rights Complaint proceedings (generated against Wells Fargo in response to its Background Checks Project) that the employee background re-screening and termination project it initiated in 2011 was actually a "business decision", not required by law as they represented to employees.

4

26.     Wells Fargo represented to Plaintiff, its other employees, the media, and the public that its employees were "disqualified by Section 19" (of the FDI Act/ 18 U.S.C.A 1829) and that Wells Fargo had "no choice" but to terminate hundreds of employees.

27.     Wells Fargo represented that it had no choice because "the FDIC strictly interprets the purposes and reach of Section 19."

28.     The law requires only that Wells Fargo and other banking institutions seek FDIC consent prior to hiring employees with disqualifying criminal records, effectively clearing such employees for work.

29.     The law by the terms of the FDIC's 1998 Statement of Policy, requires that "[u]pon notice of a conviction" an FDIC consent waiver "*must be filed.*"

30.     Wells Fargo did not file an FDIC consent waiver subsequent to recruiting Plaintiff, or prior to hiring and employing Plaintiff for over three years, despite full knowledge of his prior conviction.

31.     Upon information and belief, Wells Fargo did not file an FDIC consent waiver prior to or subsequent to employment of persons, including Plaintiff, who fully disclosed minor background convictions to Wells Fargo at the time of his hire.

32.     Wells Fargo wrongfully and maliciously failed to comply with the requirements of Section 19/ 18 U.S.C.A 1829 (securing FDIC consent) on the sole basis that it was "not its policy or practice to do so."

33.     Wells Fargo also wrongfully and maliciously failed to tell Plaintiff and hundreds of other employees whom it fired that compliance with 18 U.S.C.A. 1829, i.e. securing an FDIC consent waiver, was all that was needed to remove any potential obstacle to his employment (regarding Section 19).

34.     Wells Fargo wrongfully and maliciously failed to tell Plaintiff and hundreds of other employees whom it fired that "[t]he FDIC does not view Section 19 as punitive" and "FDIC policy is to approve [such] application[s]."

35.     Within months after Wells Fargo began terminating employees en masse pursuant to its Background Checks Project, and under the auspices of compliance with federal regulation, the FDIC expanded its "de minimis" offenses category, in order to automatically waive the consent requirement with regard to a widening pool of minor convictions.

36.     The FDIC issued a Financial Institution Letter to every FDIC-insured institution, announcing that "[c]larification of the criteria is expected to **reduce** the number of Section 19 applications and regulatory burden."

37.     Wells Fargo failed to consult with the FDIC, and failed to halt or curb its mass termination project.

38.     The FDIC *again* expanded its de minimis offenses category to automatically waive the consent requirement with regard to even more employees and issued another Financial Institution Letter to every FDIC-insured institution advising of the further expansion.

39.     Under the auspices of SAFE/Section 19 compliance, Wells Fargo

6

maliciously fired Plaintiff, and other employees, who were never convicted of anything, whose convictions were diverted or expunged, or whose convictions did not require any FDIC consent or waiver at all.

40.    Wells Fargo maliciously failed to inform its own managers, who were tasked with firing the hundreds of employees, about the FDIC consent waivers.

41.    Wells Fargo explicitly instructed the operative group for the Background Checks Project not to share this information, or the fact that the Project was actually a "business decision," with lower level management and rank-and-file employees.

42.    Pursuant to the Background Checks Project, Wells Fargo abruptly fired hundreds of exemplary employees, some of whom had worked for Wells Fargo for decades and were approaching retirement, others who had just received promotions or had bonuses forthcoming.

43.    Pursuant to the Background Checks Project, Wells Fargo denied these employees severance pay and unemployment benefits, and in many cases withheld earned bonuses and accrued leave compensation.

44.    Wells Fargo selectively revealed the information about the FDIC consent waivers to certain employees whom it preferred to retain, and even selectively offered suspended employment with no break in benefits while an FDIC consent waiver was sought.

45.    Some of Wells Fargo's employees found out about the waivers

7

independently or by hiring an attorney, and sought and secured an FDIC consent waiver on their own.

46.     When the employees who succeeded in securing FDIC clearance on their own contacted Wells Fargo about reinstating his employment, Wells Fargo either refused to re-hire by continuing to claim ineligibility, or re-hired them as new hires, with corresponding pay reduction, and stripped of all seniority and prior accrued benefits.

47.     No other FDIC-insured banking institution engaged in mass employee termination under the auspices of "compliance" with the SAFE Act, Section 19, or any related federal regulation.

48.     Many of Wells Fargo's former employees left banking permanently, under the residual impression from their experiences at Wells Fargo that they were "unemployable" in banking.

49.     Other former Wells Fargo employees, despite the shame and humiliation of being fired with the inference of dishonesty and criminal behavior, began new careers at other FDIC-insured banking institutions and have never since, notwithstanding full disclosure, had an issue with old or expunged convictions.

WHEREFORE, Plaintiff prays for the following relief:

1. A determination that Defendant's conduct was fraudulent and caused Plaintiff damages;

2. An award of all detrimental damages as a result of Defendant's fraudulent conduct including, but not limited to damages resulting from emotional distress, loss of enjoyment of life, loss of income, and mental anguish;

3. An award of compensatory damages;

4. An award of punitive damages;

5. Attorney's fees and costs; and

6. Such other and further relief as this Court may deem just and proper.

## FACTUAL ALLEGATIONS FOR JADE SAND

50.    Jade Sand ("Sand") was originally employed from May 1998 to April 2000. Second employment dates were June 2001 to August 2011. Third employment dates were September 2012 to January 2013. Sand expected to remain with Wells Fargo until retirement.

51.    Sand was not a mortgage loan originator.

52.    Sand was told, at the time of hiring, that his previous criminal conviction would not preclude his employment with Defendant.

53.    During his years at Wells Fargo he was considered an excellent employee who was valued by his manager, receiving numerous letters of recommendation and awards pertaining to his work. Jade was a recipient of the "Management Excellence" award that takes multiple nominations and a selection from a review board. Annual induction is limited to 1-5 managers.

54.    In August of 2011, Wells Fargo, through Michelle Wilke in Human Resources, called Sand to terminate his employment. Wilke, on behalf of Wells Fargo, stated that based on the SAFE act background investigation Jade Sand could no longer be employed with Wells Fargo and was no longer able to be considered for employment in the banking business based on the FDIC guidelines.

9

55.     Sand was scheduled to meet with his manager after being terminated. He was humiliated when his manager hovered over him as he collected his personal belongings in the presence of other team members.

56.     Sand's wife is an employee of Wells Fargo, as well as his mother who is a manager. During his time of termination, both were constantly being approached and questioned by other employees as to what happened. This was frustrating for all of them.

57.     Sand did not attempt to apply with any other bank based on the representations made by Wells Fargo Human Resources. As a result, Sand had to completely deplete his 401K and eventually found a job outside of banking business.

58.     Sand was not informed by Wells Fargo, regarding the FDIC waiver procedure. At a later date Sand heard that an FDIC waiver could be obtained. After obtaining the waiver, Wells Fargo rehired him with no tenure and making $20,000.00 less than before his termination.

59.     In 1998, prior to two separate background checks by Wells Fargo, of which he passed, an Order vacating the Judgment of Guilt and dismissing the charges and restoring Sand's civil rights was entered by the state of Arizona.

60.     Jade Sand passed a background check twice, prior to the background check in 2011.

## COUNT 1
## PROMISSORY ESTOPPEL

61.     Plaintiff re-alleges the allegations contained in the paragraphs set forth above and further alleges:

62.     Prior to hiring Sand, Wells Fargo promised him that his previous criminal conviction, which had been vacated, would not affect his employment with Wells Fargo.

63.     By giving Sand that assurance, referenced in paragraph #52, Wells Fargo induced Sand to accept the job and forego other business opportunities.

64.     By giving Sand assurances regarding his previous criminal conviction, which had been vacated, Wells Fargo induced Sand to accept the job and not pursue a waiver from the FDIC.

65.     Jade Sand relied on Wells Fargo's promise to his detriment and to his damage.

## COUNT 2
## FRAUD AND DECEIT

66.     Plaintiff re-alleges the allegations contained in the paragraphs set forth above and further alleges:

67.     Defendant willfully deceived Plaintiff, through representations it knew to be untrue, or recklessly made, with the intent to induce Plaintiff to alter his position to Plaintiff's injury or risk.  Plaintiff hereby did rely on, and act upon, Defendant's misrepresentations to his detriment.

68.     Particular facts supporting Plaintiff's allegations of fraud and deceit are as follows:

a. Defendant willfully deceived Plaintiff at the time he was terminated by indicating that his criminal background rendered him ineligible to work at Wells Fargo pursuant to federal law.

b. Defendant deceived Plaintiff by informing him that the background check by First Advantage revealed a conviction which prohibited his employment.

c. Defendant knew that Plaintiff did not have a conviction which would render Plaintiff ineligible for hire.

d. The initial background check report specifically indicates that Plaintiff did not have a criminal conviction that prevents him from working for Wells Fargo.

e. Defendant willfully deceived Plaintiff by informing him that federal law precluded his continued employment. This statement of fact was known to be false and was used as a ruse to terminate thousands of workers.

f. Wells Fargo willfully deceived the Plaintiff by failing to inform him that a waiver could be received from the FDIC.

g. Defendant further deceived Plaintiff by maintaining that federal law prohibited Plaintiff's employment.

h. Defendant's misrepresentations induced directly and proximately caused financial and emotional damage to Plaintiff.

## COUNT 3
## PUNITIVE DAMAGES

69.    Plaintiff re-alleges the foregoing allegations and further alleges:

70.    The conduct of Defendant and its directors, managers, employees, agents, and subcontractors described above, constitutes fraud.

71.    The representations made by Defendant were false and untrue and were material to the conduct and corporate operations which resulted in damage to Plaintiff and hundreds of other Wells Fargo employees. Wells Fargo made representations which it knew or should have known would be acted on by Plaintiff to his detriment. Defendant's conduct in deceiving and causing

significant damage to Plaintiff was carried out in such a willful, reckless, and self-serving manner as to entitle Plaintiff to an award of punitive damages.

72.     At no time was Sand convicted of a disqualifying crime, yet Wells Fargo still terminated him.

73.     Wells Fargo refused to reinstate him at the senior level--he was now a fresh hire.

74.     Wells Fargo did not even ask to see the FDIC waiver after it was received.

**VIOLATION OF THE FAIR CREDIT REPORTING ACT**

75.     Plaintiff re-alleges all foregoing allegations, and further allege:

76.     Defendant Wells Fargo Bank, N.A., in violation of 15 U.S.C.A. § 1681, et seq. of the Fair Credit Reporting Act ("FCRA"), failed to comply with the procedural protections and requirements of the FCRA when it used the consumer reports of the Plaintiff, and hundreds of other employees, to make adverse employment decisions resulting in his termination.

77.     The FCRA imposes on employers that use a background check, or other consumer report regarding an employee or job applicant, several important procedural requirements designed to protect consumers like the Plaintiff in this case.

78.     Years after hiring Plaintiff, Defendant ordered a background checks on all employees, which constitute consumer reports, from First Advantage Background Services Corp. ("First Advantage"), which is a consumer reporting agency.

79.     The consumer report regarding the Plaintiff was obtained pursuant to Wells Fargo's Background Checks Project, and was not requested or used in connection with any investigation of any law, regulation, or policy, or any investigation of suspected misconduct on the part of Plaintiff who had been diligently and competently performing his employment for Defendant for numerous years.

80.     First Advantage was and is a "consumer reporting agency" as defined in 15 U.S.C.A. § 1681(f).

81.     First Advantage was and is engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C.A. § 1681(d), to third parties such as Wells Fargo.

82.     First Advantage is not related by common ownership or affiliated by corporate control with Defendant.

83.     Defendant used the consumer reports it ordered from First Advantage to make an adverse employment decisions with regard to the Plaintiff and to terminate the Plaintiff.

84.     In doing so, Defendant failed to comply with the procedural protections and requirements imposed by the FCRA.

85.     Specifically, Defendant failed to provide clear and conspicuous written disclosures in a document that consists solely of that disclosure to Plaintiff, that a consumer report may be obtained for employment purposes.

86.     Defendant further failed to obtain a valid authorization to procure

consumer reports for employment purposes from Plaintiff.

87.   Defendant further failed to provide Plaintiff with the required notice and a copy of the consumer report upon which it based its decision to take adverse employment action against Plaintiff, within the time frames required under the FCRA.

88.   Defendant further failed to provide Plaintiff with a written summary of his FCRA rights prior to taking adverse employment action against him.

89.   Defendant terminated Plaintiff without providing any advance notice of such adverse action.

90.   The consumer reports regarding Plaintiff were provided to Wells Fargo pursuant to Wells Fargo's contract and "Scope of Work" with First Advantage.

91.   Wells Fargo delegated entirely to First Advantage, its duty to provide the notice and authorization form to Plaintiff as mandated by 15 U.S.C.A. § 1681b(b)(2).

92.   Specifically, it was Wells Fargo's standard policy to direct employees such as Plaintiff to the First Advantage website or portal, where applicants were required to authorize Wells Fargo's use of his First Advantage report using an electronic version of First Advantage's standard form.

93.   First Advantage's standard form did not comply with 15 U.S.C.A. § 1681b(b)(2) because it did not include a stand-alone document consisting only of the disclosure and authorization as required.

94.     Despite this failure, on or about April 2011, Defendant ordered for purchase an employment-purposed background check concerning Plaintiff from First Advantage.

95.     The reports that Wells Fargo ordered and purchased from First Advantage were criminal background checks that contained a host of information unrelated to the parties and to Plaintiff's performance as employees.

96.     Upon information and belief, it was/is Defendant's standard practice to rely on consumer reports as a basis to fire employees on the spot without giving them proper written advance notice of such adverse action, without first providing them with a copy of his consumer report, and without providing them with a summary of his rights under the FCRA before taking adverse action.

97.     Upon information and belief, it was/is Defendant's standard practice to use a wordy disclosure, for purposes of FCRA-required notice and authorization, which is not contained in a stand-alone document consisting solely of the disclosure, as required by the FCRA.

98.     Defendant knew, or should have known, about its legal obligations under the FCRA because these obligations are well established in the plain language of the FCRA and in the promulgations of the Federal Trade Commission.

99.     Defendant had access to substantial written materials which apprised it of its duties under the FCRA.

16

100.   To ensure knowing compliance with the FCRA, Congress requires that before any consumer reporting agency may provide consumer reports on an applicant, the reporting agency must have obtained a certification from the employer that it will comply with 15 U.S.C.A. § 1681(b)(3) whenever the employer decides to take adverse action based in whole or in part on the consumer report.

101.   Upon information and belief, Defendant knowingly executed a certification with regard to Plaintiff, providing that it would comply with the various provisions of the FCRA whenever adverse action was contemplated or taken based in whole or in part on information contained in his consumer report.

102.   Despite its certification, Defendant knowingly violated 15 U.S.C.A. § 1681b(b)(3).

103.   Despite knowing of these legal obligations, Defendant acted consciously, in breaching its known duties and depriving Plaintiff of his rights under the FCRA.

104.   As a result of these violations of Plaintiff's rights, Defendant is liable to Plaintiff for statutory damages from $100.00 to $1,000.00 pursuant to 15 U.S.C.A. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C.A. § 1681n(a)(2) for the violations alleged herein, and for attorney's fees and costs pursuant to § 1681n and § 1681o.

Dated this _____ day of July, 2017.

BEARDSLEY, JENSEN & LEE, Prof. L.L.C.

By: _____

Steven C. Beardsley
Michael S. Beardsley
4200 Beach Drive, Suite 3
P.O. Box 9579
Rapid City, SD  57709
Telephone:  (605) 721-2800
Facsimile:  (605) 721-2801
Email:  sbeards@blackhillslaw.com
mbeardsley@blackhillslaw.com
*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff

demands a jury trial of all his claims.

Steven C. Beardsley